IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SONIA R. HAMMOCK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. |
| | § | |
| v. | § | 07-CV-00896-WHA-TFM |
| | § | |
| NELL E. LAMB and TODD SWING, | § | |
| | § | |
| Defendants. | § | |

**SUPPLEMENTAL EVIDENTIARY SUBMISSION
IN SUPPORT OF PLAINTIFF'S MOTION TO REMAND**

COMES NOW the Plaintiff, Sonia R. Hammock, and offers the following supplemental evidentiary submission in support of her previously filed motion to remand:

EXHIBIT 5          Deposition of Nell E. Lamb


/s/ Tedford Taylor
TEDFORD TAYLOR

Attorney for Plaintiff


OF COUNSEL:

TAYLOR & TAYLOR
2130 Highland Avenue
Birmingham, Alabama 35205
(205) 558-2800 (phone)
tedford@taylorlawyers.com (e-mail)

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed this Notice of Appearance so that service will be sent by the ECMF System via electronic mail to counsel of record on this the 15th day of February, 2008:

Larry R. Bradford, Esq.
lbradford@bradfordsears.com


/s/ Tedford Taylor
TEDFORD TAYLOR

# FREEDOM COURT REPORTING

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE MIDDLE DISTRICT OF ALABAMA
 3           NORTHERN DIVISION
 4
 5    CIVIL ACTION NO:  07-CV-00896-WHA-TFM
 6
 7
 8    SONIA R. HAMMOCK,
 9          Plaintiff,
10    vs.
11    NELL E. LAMB and TODD SWING, et al.,
12          Defendants.
13
14
15       DEPOSITION TESTIMONY OF
16            NELL E. LAMB
17
18
19    JANUARY 22, 2008
20    12:30 P.M.
21    COURT REPORTER:  JODI D. DUBOSE, CSR
22
23
```

Page 2

```
 1        S T I P U L A T I O N S
 2          It is hereby stipulated and
 3    agreed, by and between the parties
 4    through their counsel, that the
 5    deposition of NELL E. LAMB may be taken
 6    before Jodi D. DuBose, Certified
 7    Shorthand Reporter and Notary Public
 8    for the State of Alabama At Large, at
 9    the offices of Bradford & Sears, PC,
10    2020 Canyon Road, Suite 100,
11    Birmingham, Alabama 35216 on
12    January 22, 2008, commencing at
13    12:30 p.m.
14          It is further stipulated and
15    agreed that the signature to and the
16    reading of the deposition by the
17    witness are waived, the deposition to
18    have the same force and effect as if
19    full compliance had been had with all
20    laws and rules of Court relating to the
21    taking of depositions.
22          It is further stipulated and
23    agreed that it shall not be necessary
```

Page 3

```
 1    for any objections to be made by
 2    counsel as to any questions except as
 3    to form or leading questions, and that
 4    counsel for the parties may make
 5    objections and assign grounds at the
 6    time of trial, or at the time said
 7    deposition is offered in evidence, or
 8    prior thereto.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 4

```
 1        A P P E A R A N C E S
 2
 3
 4    FOR THE PLAINTIFF:
 5       TEDFORD TAYLOR, Esq.
 6       TAYLOR & TAYLOR
 7       2130 Highland Avenue
 8       Birmingham, Alabama 35205
 9
10
11    FOR THE DEFENDANTS:
12       JEREME LOGAN, Esq.
13       BRADFORD & SEARS, PC
14       2020 Canyon Road, Suite 100
15       Birmingham, Alabama 35216
16
17
18
19
20
21
22
23
```

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1              I N D E X
2
3
4    EXAMINATION BY:              PAGE
5    MR. TAYLOR              7
6    CERTIFICATE            80
7
8
9              E X H I B I T S
10
11
12   PLAINTIFF'S              PAGE
13   No. 1 - Driver's Licenses    11
14   No. 2 - 2006 W-2        21
15   No. 3 - Production Requests   34
16   No. 4 - Deposition Notice    34
17   No. 5 - Dental Invoice     61
18
19        --oOo--
20
21
22
23

Page 7

1        MR. LOGAN:  That's fine.
2        MR. TAYLOR:  Yes.
3
4    EXAMINATION BY MR. TAYLOR:
5        Q.  Ms. Lamb, would you state your
6    full name for the record, please?
7        A.  Nell Elaine Lamb.
8        Q.  What do you go by, Ms. Lamb?
9        A.  I go by Elaine.
10        Q.  Do you have any nicknames or
11    anything else that you may go by?
12        A.  No.
13        Q.  And what is your age,
14    Ms. Lamb?
15        A.  Forty-seven.
16        Q.  And your date of birth?
17        A.  January 17th, 1961.
18        Q.  Is your Social Security number
19    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?
20        A.  Correct.
21        Q.  Are you married?
22        A.  No.
23        Q.  Have you ever been married?

Page 6

1        I, Jodi D. DuBose, a Certified
2    Shorthand Reporter and Notary Public
3    for the State of Alabama At Large,
4    acting as Commissioner, certify that on
5    this date, pursuant to the Federal
6    Rules of Civil Procedure, and the
7    foregoing stipulations of counsel,
8    there came before me at the offices of
9    Bradford & Sears, PC, 2020 Canyon Road,
10    Suite 100, Birmingham, Alabama 35216,
11    on January 22, 2008, commencing at or
12    about 12:30 p.m., NELL E. LAMB, witness
13    in the above cause, for oral
14    examination, whereupon, the following
15    proceedings were had:
16
17        NELL E. LAMB,
18    having been first duly sworn
19    (affirmed), was examined and testified
20    as follows:
21
22        COURT REPORTER:  Usual
23    stipulations?

Page 8

1        A.  No.
2        Q.  Any children?
3        A.  No.
4        Q.  Where did you graduate from
5    high school?
6        A.  The Williams School in
7    Montgomery, Alabama.
8        Q.  And did you have the
9    opportunity to go on to college,
10    Ms. Lamb?
11        A.  Yes, I did.
12        Q.  Where did you attend college?
13        A.  Troy State University in
14    Montgomery, Alabama, School of Nursing.
15        Q.  Are you from Montgomery
16    originally?
17        A.  I was born on Maxwell Air
18    Force Base.  Military child.
19        Q.  And your major was nursing?
20    You were in the School of Nursing; is
21    that correct?
22        A.  Correct.
23        Q.  And what year did you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

1 graduate?
2    A. 1981.
3    Q. And have you been in the
4 practice of nursing since that time?
5    A. Yes, I have.
6    Q. You've brought some documents
7 here today, which I have had an
8 opportunity to look at before the
9 deposition. And one of the -- some of
10 the documents were licenses. What
11 current licenses do you have?
12    A. What type of license? Nursing
13 or --
14    Q. We'll start with nursing.
15    A. I have a California nurse's
16 license, Alabama, Virginia, and
17 Michigan.
18    Q. When did you apply for your
19 Michigan nursing license?
20    A. I don't know the exact date.
21 July. The month of July.
22    Q. I've made copies of some of
23 your documents and want to mark them.

1 I want to show you first a copy of what
2 is your driver's license and then two
3 of your nursing board licenses. Your
4 current driver's license is -- do you
5 currently have an Alabama driver's
6 license?
7    A. Yes.
8    Q. Are you licensed to drive in
9 Michigan?
10    A. Do I have a Michigan driver's
11 license?
12    Q. Yes.
13    A. No.
14    Q. Looking at the copy of your
15 driver's license, tell me your
16 Alabama driver's license expires.
17    A. 1/25/2010.
18    Q. Okay. In looking at that same
19 piece of paper that has your Alabama
20 nursing license on it, when does your
21 Alabama nursing license expire?
22    A. 12/31/2008.
23    Q. I'd like to mark this as

1 Exhibit 1 to the deposition.
2
3       (Whereupon, Plaintiff's Exhibit
4       Number 1 was marked for
5       identification and is attached to
6       the original transcript.)
7
8    Q. I'm also going to show you a
9 copy of your current Virginia license
10 that you have brought to us today.
11 Could you tell me when that license
12 expires?
13    A. January the 31st, 2009.
14    Q. And what we can do is add
15 these licenses and attach this to
16 Exhibit 1, so it doesn't make it too
17 complicated.
18       I'm also going to show you
19 your State of Michigan license, and ask
20 you when that license is set to expire?
21    A. March 31st, 2008.
22    Q. One more, Ms. Lamb, I want to
23 show you your California license, going

1 back to that original page, and ask you
2 when that license expires?
3    A. February 28th, 2009.
4    Q. Ms. Lamb, who is your present
5 employer?
6    A. Sparrow Hospital.
7    Q. Where is Sparrow located?
8    A. Lansing, Michigan.
9    Q. How long have you been working
10 at Sparrow Hospital?
11    A. I started last week.
12    Q. Prior to working at Sparrow
13 Hospital, where were you employed?
14    A. Charlottesville, Virginia as a
15 travel nurse.
16    Q. What was the name of your
17 employer?
18    A. On Assignment.
19    Q. When did you start working
20 with On Assignment?
21    A. 10/06.
22    Q. And when did you continue to
23 work at On Assignment until you began

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1  at Sparrow Hospital?
2      A.  I stopped working with On
3  Assignment 6/07 and I have not worked
4  until I just started.
5      Q.  Did you apply for any jobs
6  during that six-month period that you
7  weren't working?
8      A.  In Michigan at two other
9  hospitals.
10     Q.  Did you apply for any jobs in
11 Alabama?
12     A.  No.
13     Q.  What two hospitals in Michigan
14 did you apply for jobs?
15     A.  Owasso.  And I don't know the
16 name of the other.
17     Q.  Is it Owasso Hospital?
18     A.  Uh-huh.
19         MR. LOGAN:  Is that a yes?
20         THE WITNESS:  Yes, I'm sorry.
21     Q.  (BY MR. TAYLOR:)  If you can
22 think of the name of the other
23 hospital, if you would, just interrupt

Page 14

1  me at any time.
2      A.  Will do.
3      Q.  Or if it comes to you later,
4  let your attorney know.
5      A.  Okay.
6      Q.  Are you a member of any
7  professional organizations?
8      A.  No.
9      Q.  Nursing organizations outside
10 of -- nothing like that?
11     A.  No.
12     Q.  Have you ever worked for
13 Alabama Home Health Care?
14     A.  Yes.
15     Q.  What years did you work for
16 them?
17     A.  I'd have to get the rest of my
18 resume.  I don't know offhand.
19     Q.  Okay.  Was it within the last
20 five years?
21     A.  I think I got the rest of my
22 resume in my --
23         THE WITNESS:  Can I get that?

Page 15

1      MR. LOGAN:  Sure.
2      A.  What do you need again?
3      Q.  (BY MR. TAYLOR:)  The Alabama
4  Home Health Care.  I think it's known
5  as Alacare as well.
6      A.  I've never heard of Alacare.
7      Q.  That might be a newer thing.
8      A.  Alabama Home Health?  I'm
9  sorry; no.  I've done home health, but
10 unless they've changed their name.  You
11 called it Alabama Home Health Care?
12     Q.  I believe it's been Alabama
13 Home Health Care for a long time and it
14 recently changed to Alacare.
15     A.  No Alabama.  West Alabama?
16     Q.  I don't think so.  How about
17 Caregivers Home Health Agency?
18     A.  We're talking about within the
19 last five years?
20     Q.  I believe so.
21     A.  No.
22     Q.  Well, we'll move on.
23     A.  If there's a different name.

Page 16

1      Q.  Ms. Lamb, in my request for
2  production, and also in my notice to
3  take deposition, I asked you to bring
4  some documents and some you brought
5  today.  I asked you to bring some tax
6  documents.  And you've brought a
7  2006 W-2 that I'll show you now.  This
8  W-2 was sent to you from the Prison
9  Health Service, Incorporated?
10     A.  Yes.
11     Q.  They're located in Brentwood,
12 Tennessee.  For what employment was
13 that?
14     A.  Tutwiler Prison in Wetumpka.
15     Q.  What dates -- I'll tell you
16 what, it might be easier to go through
17 your employment history first before we
18 get into that.
19     A.  Okay.
20     Q.  Give us a little more
21 organization.
22         Before On Assignment, where
23 you were employed from October 2006 to

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  June of 2007, where were you employed
2  prior to that?
3      A.  Prison Health Services, which
4  is Tutwiler Prison, from 9/30/05 to
5  3/13/06.
6          At the same time, I worked
7  Adidas Health Care, 3/05 to 7/21/05.
8      Q.  And prior to March of '05,
9  where did you work?
10     A.  Travel Nurse Across America,
11  7/03 to 11/03.
12     Q.  Where were they located?
13     A.  I'm trying to remember.  That
14  was one travel assignment in
15  Bakersfield, California.
16     Q.  And that's where you were
17  located in Bakersfield, California?
18     A.  That's where --
19     Q.  Travel Nurse Across America,
20  is that --
21     A.  I traveled.
22     Q.  Where is that company located?
23     A.  I don't know offhand.

Page 18

1      Q.  Okay.  Now, prior to July of
2  2003, where were you employed?
3      A.  I did -- from 12/02 to 4/02, I
4  did private duty nursing with my mother
5  for cancer.  I don't know if you can
6  call that employed.
7      Q.  Now, that brings us back to
8  taxes, W-2s and 1099s.
9      A.  Okay.
10     Q.  In 2007, you were employed by
11  On Assignment in Charlottesville, North
12  Carolina; is that right?
13     A.  Correct.
14     Q.  Where were you located during
15  that employment?  In Charlottesville?
16     A.  In Charlottesville.  Do you
17  want the address?
18     Q.  Yes.
19     A.  844 C-A-T-A-L-P-A Court,
20  Charlottesville, Virginia 22903.
21     Q.  Did you work in Alabama during
22  the year 2007?
23     A.  I have not worked in Alabama

Page 19

1  since the prison.
2      Q.  Have you received a W-2 and/or
3  a 1099 from On Assignment for 2007?
4      A.  If they've mailed it, I have
5  not received it.
6      Q.  Okay.  Have you filed Federal
7  tax returns or State tax returns?
8      A.  Not for 2005, '6, or '7.
9      Q.  And in 2005, you were located
10  in Alabama; is that correct?
11     A.  Yes.
12     Q.  Did you make more than $4,600
13  per year in 2005?
14     A.  I honestly don't know.  I
15  think so, but I don't know.
16          MR. LOGAN:  Are you guessing?
17          THE WITNESS:  I'm guessing.
18          MR. LOGAN:  Don't guess.
19     A.  I do not know.
20     Q.  (BY MR. TAYLOR:)  In 2006, did
21  you make more than $4,600 from the
22  Prison Health Services?
23     A.  Yes.

Page 20

1      Q.  At the same time you were
2  working for Prison Health Services, you
3  were also working for Adidas; is that
4  correct?
5      A.  Correct.
6      Q.  Do you believe you made more
7  than $18,000 in 2006?
8          MR. LOGAN:  If you know.
9      A.  I don't know.
10     Q.  (BY MR. TAYLOR:)  Do you have
11  your W-2 from Adidas?
12     A.  No, I don't.
13     Q.  Is that something you could
14  put your hands on?
15     A.  No, it isn't.
16     Q.  Could you contact Adidas and
17  get the information?  Is that possible?
18     A.  I plan on trying to get all of
19  my W-2 forms, but I'm going to have to
20  call the IRS and I don't know what time
21  frame.
22     Q.  Is that something you could
23  do?  When you get those documents, can

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

Page 21

1  you give those to your attorney as soon
2  as possible?
3     A.  I will attempt.
4     Q.  I want to get back and mark
5  your W-2, 2006 W-2 as Exhibit 2 of this
6  deposition.
7     A.  Okay.
8     Q.  And offer it.
9
10     (Whereupon, Plaintiff's Exhibit
11     Number 2 was marked for
12     identification and is attached to
13     the original transcript.)
14
15     Q.  Ms. Lamb, this may be as good
16  a time as any to go through a request
17  for production that I filed November
18  the 29th, 2007 and served, and I'll
19  show that to you.
20        This is a document requesting
21  documents for this limited purpose
22  deposition and during this discovery
23  period.  Are you familiar with that

Page 22

1  document?  Have you seen this document?
2     A.  Yes.
3     Q.  If you would, turn to the back
4  page and let me know when the service
5  date on that document is.
6     MR. LOGAN:  Of which document?
7     A.  And what am I looking for?
8  I'm sorry.
9     Q.  (BY MR. TAYLOR:)  There is a
10  date of service on the back when it was
11  served upon you or your attorney.
12     A.  29th day of November, 2007.
13     Q.  Are you aware that you have
14  30 days to answer a document request
15  like this?
16     MR. LOGAN:  Object to form.
17  You can answer if you know.
18     A.  Oh, no.
19     Q.  (BY MR. TAYLOR:)  Well, would
20  you agree with me that December the
21  29th would be when these documents are
22  due?
23     MR. LOGAN:  Object to form.

Page 23

1     A.  Yes.  I don't know if that's
2  the --
3     Q.  (BY MR. TAYLOR:)  Okay.  Let's
4  go through these one by one, if you
5  don't mind.
6     A.  Okay.
7     Q.  And let's see what's been
8  produced today, January the 22nd, 2008.
9        Number 1, I asked for driver's
10  license, professional licenses, or any
11  other licenses.  Have you brought all
12  of your licenses here today?
13     A.  Firearm permit.
14     Q.  You do have a firearm permit?
15     A.  Yes, I do.  Well, I don't have
16  the permit.  I had one.
17     Q.  Okay.  And was that in
18  Alabama?
19     A.  That was in Lowndesboro.
20     Q.  Do you know when that firearm
21  permit expired?
22     A.  No, I don't.
23     Q.  Okay.  Do you believe it is

Page 24

1  current today?
2     A.  I don't know.
3     Q.  Could you get a copy of your
4  permit and give that to your lawyer
5  when you get a chance?
6     A.  Can they mail that to me?  Can
7  they give that to me by my not being
8  there in-person?
9     Q.  That may be something you need
10  to talk to them about.
11     A.  If they can do it without my
12  being there in-person and give it to me
13  over the phone.
14     Q.  Some sort of verifications
15  that you have, that will be fine.
16        Going to Number 2, I had asked
17  for all tax returns, Federal, State,
18  1099s, W-2s for '05, '06, and '07.  I
19  know you brought the W-2 for 2006.  At
20  your earliest convenience, could you
21  get your W-2s for 2005 and '07?
22     A.  I will call the companies I
23  worked for.

6  (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1    Q. All right.
2        MR. LOGAN: Ted, we'll also
3    sign whatever authorization that you
4    need so you can subpoena the records as
5    well. We'll do our best to try to get
6    it in so that we can get them in the
7    fastest way as possible.
8        MR. TAYLOR: Okay.
9        Q. (BY MR. TAYLOR:) Have you
10   registered to vote in the State of
11   Michigan?
12       A. No, I haven't.
13       Q. Are you currently registered
14   to vote in the State of Alabama?
15       A. Yes, I am.
16       Q. Do you have your voter
17   registration card?
18       A. No, I don't.
19       Q. Have you notified the state --
20   strike that.
21          When was the last time you
22   voted in the State of Alabama?
23       A. I don't know. I can make a

Page 26

1    guess, but I don't know.
2        Q. Okay. Do you remember voting
3    in the 2006 election? Any of the 2006
4    election?
5        A. It would be a guess.
6        Q. Okay. Automobiles -- between
7    the dates of November the 23rd and
8    September the 24th, I've asked for
9    registration for any automobiles you
10   may have owned. Do you have that?
11       A. I am not sure I owned any. My
12   mother owned a Honda Accord and I'm not
13   sure if she put my name on the title or
14   not.
15       Q. Does your mother still have
16   that Honda Accord?
17       A. Uh-huh. Yes, she does.
18       Q. Could you produce the
19   registration?
20       A. I'll ask her.
21       Q. Okay.
22       A. I don't know if she can.
23       Q. If you would turn that over to

Page 27

1    your lawyer as soon as possible.
2        A. Okay.
3        Q. On Number 5, I asked you to
4    produce any charitable contributions
5    you've made between November 23rd,
6    2005, the date of the accident, and
7    September 24th, 2007. Have you made
8    any charitable contributions during
9    that time?
10       A. No.
11       Q. How about --
12       A. Not that I have a record of.
13       Q. Okay. What charitable giving
14   do you not have a record of?
15       A. To the police force, to the
16   fire department.
17       Q. And was that the police force
18   and fire department in Alabama?
19       A. In Alabama, and in Virginia.
20   Yeah, Virginia.
21       Q. Okay. That's in Lowndesboro,
22   Alabama?
23       A. Probably -- no. Just somebody

Page 28

1    that called on the phone.
2        Q. Okay.
3        A. So I don't know which -- if it
4    was Montgomery or Selma --
5        Q. Okay.
6        A. -- or --
7        Q. Do you own any property in the
8    State of Alabama?
9        A. No.
10       Q. Have you ever owned any
11   property in the State of Alabama?
12       A. Yes.
13       Q. When did you own that
14   property?
15       A. I could not find the bill of
16   sale. I can tell you who I sold it to
17   and the lawyer who did the deed or the
18   bill of sale.
19       Q. Okay. Who was the closing
20   attorney on that sale?
21       A. Ted Bozeman.
22       Q. And where was that property
23   located?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1    A.   Lowndesboro, Alabama.
2    Q.   What dates did you own that
3  property?  Do you --
4    A.   It's been in my family for a
5  while.  My mother put it in my name and
6  hers after my father died.  And I can't
7  remember the exact year my father died.
8    Q.   Who was it sold to?
9    A.   Tyson Howard.
10    Q.   Do you remember what year that
11  it was sold?
12    A.   Either 2006 or 2007.
13    Q.   What kind of property was it?
14    A.   It was seven and a half acres
15  off of Highway 80.
16    Q.   Did it have a house on it?
17    A.   A double-wide trailer.
18    Q.   Any other property that you've
19  owned?
20    A.   In Alabama?
21    Q.   In Alabama.
22    A.   No.
23    Q.   Have you owned any property in

Page 30

1  Virginia?
2    A.   Yes.
3    Q.   What property have you owned
4  in Virginia?
5    A.   That was in Clintwood,
6  Virginia.  Again, my mother put my name
7  on it after my father died.
8    Q.   What kind of property was
9  that?
10    A.   Ten acres with a home.
11    Q.   Do you currently own that
12  property?
13    A.   No.
14    Q.   When did you sell that
15  property?
16    A.   I do not know.
17    Q.   Prior to '06?
18    A.   Oh, yes.
19    Q.   Within the last five years?
20    A.   Yes.
21    Q.   Within the last five years?
22    A.   Within the last five years.
23    Q.   How about prior to '05?

Page 31

1    A.   I don't know.
2    Q.   Have you ever owned any
3  property in California?
4    A.   No.
5    Q.   Michigan?
6    A.   No.
7    Q.   We talked a little bit about
8  automobiles and you talked about the
9  Honda Civic that you may own and you're
10  going to follow up on that.
11    A.   Yes.
12    Q.   How about any automobiles that
13  you've owned, let's say, in the last
14  five years?
15    A.   Explorer.
16    Q.   Can you remember when?
17    A.   It was -- it was last titled
18  to me in Lowndesboro, so the license
19  and selling would be in Lowndesboro.
20    Q.   Do you have any of that
21  paperwork?
22    A.   No, I do not.
23    Q.   Did you have the Explorer

Page 32

1  prior to the Civic?
2    A.   Yes.
3    Q.   And did you get rid of the
4  Explorer before you used your mom's or
5  your Civic?
6    A.   Yes.
7    Q.   Ms. Lamb, when did you get
8  here to Alabama today?
9    A.   At 9:55.
10    Q.   Are you staying tonight?
11    A.   Yes, I am.
12    Q.   Who are you staying with?
13    A.   My sister is coming up from
14  Hope Hull and we're staying in a hotel.
15  And I fly out tomorrow morning back to
16  Michigan.
17    Q.   What's your sister's name?
18    A.   Barbara Grant.
19    Q.   How long has she lived in
20  Hope Hull?
21    A.   She moved back from Utah to
22  Hope Hull -- I don't know the number of
23  years.

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1    Q.  More than five?
2    A.  I don't think five.  May be --
3  I don't know.
4    Q.  Okay.  More than three?
5    A.  I think.
6    Q.  Okay.
7    A.  I can give you that.
8    Q.  And you're leaving tomorrow,
9  you say?
10    A.  Yes.
11    Q.  Have you ever given a
12  deposition before?
13    A.  No.
14    Q.  And how were you notified of
15  this deposition?
16    MR. LOGAN:  Before you answer,
17  don't talk about any conversations that
18  you've had with me or anybody in my
19  office.  But you can tell him when you
20  were notified about your deposition.
21    A.  When I received this or when I
22  was notified that I was coming here?
23    Q.  (BY MR. TAYLOR:)  Okay.

Page 34

1    A.  What are you asking?
2    Q.  I might can clear it up.
3    A.  Okay.
4    Q.  I'm going to mark my requests
5  for production as Plaintiff's Exhibit
6  Number 3.
7
8      (Whereupon, Plaintiff's Exhibit
9      Number 3 was marked for
10      identification and is attached to
11      the original transcript.)
12
13    MR. TAYLOR:  And offer that at
14  this time.
15    Q.  (BY MR. TAYLOR:)  I'm also
16  going to go ahead and mark the notice
17  of deposition for today's deposition as
18  Plaintiff's Exhibit 4.
19
20      (Whereupon, Plaintiff's Exhibit
21      Number 4 was marked for
22      identification and is attached to
23      the original transcript.)

Page 35

1    Q.  Does that look familiar,
2  Ms. Lamb, being the notice for
3  deposition, Plaintiff's Exhibit 4?
4    MR. LOGAN:  Did it change
5  other than the date and the time from
6  the January the 19th --
7    MR. TAYLOR:  No.  They're
8  requests for the same.  They're a
9  similar document with a different date.
10    A.  I received this -- I was faxed
11  this yesterday or the day before
12  yesterday?
13    MR. LOGAN:  You actually
14  received a copy of it in the mail
15  before then.  But the most recent
16  information about your flight included
17  a copy of this as well.
18    THE WITNESS:  Okay.
19    Q.  (BY MR. TAYLOR:)  But you were
20  sent a notice of deposition; is that
21  correct, Ms. Lamb?
22    A.  Yes.
23    Q.  Okay.  And your attorneys also

Page 36

1  notified you that -- without telling me
2  anything they've said, they notified
3  you that this was going on?
4    MR. LOGAN:  She was aware of
5  her deposition before she showed up
6  today, if that's fair.
7    Q.  (BY MR. TAYLOR:)  Okay.  I
8  want to go through and get a history of
9  addresses, starting with your current
10  address where you claim to be living.
11    A.  Okay.  I live at 225 West
12  Street, Post Office Box 92, Laingsburg,
13  L-A-I-N-G-S-B-U-R-G, Michigan 48848.
14    Q.  Is that a physical address?
15    A.  225 is a physical address.
16  They do not mail there.  So the
17  P.O. Box is where the mail comes.
18    Q.  The physical address, 225 West
19  Street, is that a house or an
20  apartment?
21    A.  A house.
22    Q.  What kind of property is it
23  located on?  Better question, who lives

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  there with you?
2      A.  My mother, my sister, and her
3  children.  Her husband and children.
4      Q.  And is this your same sister
5  Barbara --
6      A.  No.
7      Q.  It's not?  What's your
8  sister's name?
9      A.  Edith Law.
10     Q.  And her husband is Steven Law?
11     A.  Correct.
12     Q.  Who owns the property at
13  225 West Street?
14     A.  Edith and Steven.
15     Q.  Do you pay them rent?
16     A.  When I have any money in my
17  account.
18     Q.  And how long have you been
19  staying at that address?
20     A.  I went there at the end of
21  June.  I stayed there until I went up
22  to help my mother move her property in
23  Alabama to move up there also.

Page 38

1      Q.  And when was that?
2      A.  Late July.
3      Q.  And how long were you -- you
4  were in Alabama in late July?
5      A.  Back and forth in July.  And
6  then back to Edith's house and then
7  back with mom.  Then we went back --
8      Q.  Okay.
9      A.  -- for the final time.
10     Q.  When did you go back for the
11  final time?
12     A.  Let's see.  I was scheduled to
13  go back on the 21st of September, got
14  sick, and we actually rented a car on
15  October the 1st and got there on
16  October the 3rd.
17     Q.  So I'm correct in saying that
18  you stayed in Alabama from July '07 to
19  October of '07?
20        MR. LOGAN:  Object to form.
21     A.  We were part of the time in
22  Michigan and part of the time in
23  Alabama.

Page 39

1      Q.  (BY MR. TAYLOR:)  How many
2  times did you go back to Michigan
3  during that period of time?
4      A.  Once.
5      Q.  And what were the dates?
6      A.  I don't know.
7      Q.  Prior to staying at 225 West
8  Street, what was your address?
9      A.  Where did I stay?
10     Q.  Uh-huh.
11     A.  I stayed either with my mother
12  at 130 Lost Trail.  I stayed with my
13  uncle at 120 Lost Trail.  I stayed with
14  my brother in Montgomery.  How long are
15  we looking for?
16     Q.  Well, I guess I need to get
17  back and get more specific dates.
18        When you were with your mother
19  at 130 Lost Trail --
20     A.  Uh-huh.
21     Q.  -- how long were you there and
22  what dates were you there?
23     A.  In between travel assignments,

Page 40

1  and I can't tell you which times I
2  stayed.  She traveled with me on some
3  of those assignments.  I can't tell you
4  which times I stayed with her or stayed
5  with my uncle or which times I stayed
6  with my brother, which times I stayed
7  with Edith in Michigan.
8      Q.  What's your brother's address
9  in Montgomery?
10     A.  I don't know.
11     Q.  Dalford Street?
12     A.  Dalford Lane or Dalford
13  Street.
14     Q.  What's his name?
15     A.  Michael Lamb.
16     Q.  Is he married?
17     A.  Yes, he is.
18     Q.  What's his wife's name?
19     A.  Valerie Lamb.
20     Q.  Do they have any children?
21     A.  None living in their home.
22     Q.  When you were working at
23  Tutwiler, where were you staying during

10 (Pages 37 to 40)

# FREEDOM COURT REPORTING

Page 41

1  that period of time?
2      A.  I'm trying to remember if the
3  house was sold in Lowndesboro.  With my
4  uncle, I think.  I believe.
5      Q.  With your uncle at 120 Lost
6  Trail?
7      A.  Yes, or -- I'm sorry.  I don't
8  know.  I don't know if we'd sold the
9  property yet in Lowndesboro.  I could
10  be mistaken.
11      Q.  Well, let me try to get a
12  frame of reference on time with
13  these -- when you were staying at these
14  places in Alabama.
15      A.  Okay.
16      Q.  From September the 30th, 2005
17  to July the 31st, 2000 until March the
18  13th, 2006, you were working at Prison
19  Health Services?
20      A.  Yes.
21      Q.  During that six-month period
22  of time --
23      A.  -- I lived in Lowndesboro.

Page 42

1      Q.  Is that with your uncle?
2      A.  I'm not sure which.  I don't
3  know if we'd sold the property yet.
4      Q.  Okay.  If you had not with
5  him, would you have been with your mom
6  at 130 Lost Trail?
7      A.  If we'd sold the property, I'd
8  been with my mom at 130; if we hadn't
9  sold the property, I'd been at
10  112 Sullivan Hill.
11      Q.  Now, 112 Sullivan Hill, that's
12  the property; is that right?
13      A.  That was sold, yes.
14      Q.  At the time of the accident,
15  you didn't have an Alabama driver's
16  license; is that correct?
17      A.  Correct.
18      Q.  The address that you gave to
19  the police was 112 Sullivan Hill; is
20  that correct?
21      A.  I'd have to look at the
22  accident report.
23      Q.  I'll show you the accident

Page 43

1  report real quick.  I won't mark it.
2      A.  Yes.
3      Q.  Okay.
4      MR. LOGAN:  Ms. Lamb, do you
5  recall actually giving the officer your
6  address, or did he get that off of your
7  license?
8      THE WITNESS:  I had a Virginia
9  license at the time, so I would have
10  given that to him.
11      MR. LOGAN:  Okay.
12      Q.  (BY MR. TAYLOR:)  So that
13  seven and a half acres is the
14  112 Sullivan Hill?
15      A.  Yes.
16      Q.  And that's the land y'all
17  sold?
18      A.  Yes.
19      Q.  Okay.  I want to ask you about
20  relatives in Alabama.  We've covered
21  that a little bit with these
22  residences.  And I hate to repeat some
23  of this, but why don't we start with

Page 44

1  Michael Lamb and go from there.  If you
2  would, just kind of enumerate what
3  relatives you have remaining in Alabama
4  at this time.
5      A.  As far as siblings or extended
6  further?
7      Q.  Let's start with immediate
8  family and go out from there.
9      A.  I have a brother, Michael.
10      Q.  And he lives?
11      A.  Dalford Lane in Montgomery.
12  And a sister, Barbara Grant, and she's
13  in Hope Hull.
14      Q.  Okay.
15      A.  That's the only two.
16      Q.  How about extended family,
17  uncles?
18      A.  I have an uncle, Ned Sullivan.
19  And he lives at 120 Lost Trail,
20  Lowndesboro.  Now, I have cousins, but
21  I don't know where they live.
22      Q.  Okay.
23      A.  I have nieces and nephews and

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1   I don't know where they live.
2    Q.  Okay.  Where were you on
3  September the 24th, 2007?  That was the
4  date of service.
5    A.  I was at 130 Lost Trail.
6    Q.  How long had you been there?
7  How long had you been staying there on
8  that date?
9    A.  I don't know.
10    Q.  More than two weeks?
11    A.  Yes.
12    Q.  More than a month?
13    A.  Yes.
14    Q.  More than two months?
15    A.  Consecutively?
16    Q.  Uh-huh.
17    A.  I don't know.
18    Q.  When a process server came to
19  your house, who answered the door?
20    A.  My mother.
21    Q.  Who else was in the house at
22  that time?
23    A.  Myself.  I was asleep.

Page 47

1  to Michigan?
2    A.  We left on October 1st.
3    Q.  How did you return to
4  Michigan?
5    A.  Rental car.
6    Q.  Did you rent that car in
7  Montgomery?
8    A.  Yes.  You have the copy --
9    Q.  I do have -- I'm sorting
10  through it.
11    A.  Okay.
12    Q.  Mine looks a little different
13  than the original.
14    A.  Okay.  That was the day we
15  turned it in in Michigan, on the 3rd.
16    Q.  At that time, was your
17  furniture in Alabama?
18    A.  Yes.
19    Q.  Is your furniture -- does it
20  remain in Alabama to this date?
21    A.  No.  My brother-in-law and my
22  sister ended up going up to finish
23  packing and bringing the rest down.

Page 46

1    Q.  Just the two of you?
2    A.  Yes.
3    Q.  Had you been working the day
4  before?
5    A.  No.
6    Q.  Did your mother make a
7  statement that you had been working the
8  day before and that's why you were
9  sleeping?
10    A.  No.  I was ill.
11    Q.  Did your mother wake you up?
12    A.  I don't remember.
13    Q.  Were you personally served
14  with the lawsuit on that day in
15  Alabama?
16    A.  My mother handed it to me.
17    Q.  Okay.  Did you meet our
18  process server?
19    A.  Yes.
20    Q.  And he saw you receive the
21  lawsuit in Alabama?
22    A.  Yes.
23    Q.  How long after that did you go

Page 48

1    Q.  When was that?
2    A.  I don't know.
3    Q.  It was after October the 3rd?
4    A.  Yes.
5    Q.  Was it after November the 1st?
6    A.  Yes.
7    Q.  After December the 1st?
8    A.  No.  I think it was in
9  November.  I was too ill to help mom,
10  so they took his vacation.
11    Q.  What about your personal
12  belongings and clothes and that sort of
13  thing?
14    A.  My clothing and all of that
15  went with me.
16    Q.  On October the 3rd?
17    A.  (Witness nods head.)  As well
18  as my TV.
19    Q.  Have you submitted a change of
20  address form to the post office?
21    A.  Yes.
22    Q.  When did you do that?
23    A.  Before we left.  End of

12 (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 49

1 September.
2    Q.  Would that be after you were
3 served with the lawsuit?
4    A.  Yes.
5    Q.  How are you related to Todd
6 Sweeney?  What is your relationship
7 with him?
8    A.  He is my niece's husband.
9    Q.  Does he live at 225 West
10 Street?
11    A.  He lives next door.
12    Q.  He lives next door.  Is it a
13 different address?
14    A.  Yes.
15    Q.  What's his address in
16 Michigan?
17    A.  I don't know the number, the
18 house number.
19    Q.  But he lives next to 225 West?
20    A.  Correct.
21    Q.  The property at 225 West
22 Street, is it several acres?
23    A.  I don't know.

Page 50

1    Q.  How many structures are on it?
2    MR. LOGAN:  Object to form.
3    A.  One.
4    Q.  (BY MR. TAYLOR:)  And you all
5 live in that dwelling?
6    A.  Correct.
7    Q.  Do you know Carl Bordwine and
8 Erma Bordwine?
9    A.  No.
10    Q.  Who is Maxine Sullivan?
11    A.  My mother.
12    Q.  And what was her -- does she
13 currently have an address in Alabama?
14    A.  No.
15    Q.  Has she had an address in
16 Alabama?
17    A.  Yes.
18    Q.  What was that address?
19    A.  130 Lost Trail.
20    Q.  Ms. Lamb, in your
21 interrogatories, you answered that you
22 had some pets.  Do you have a pet?
23    A.  My mother has two cats.

Page 51

1    Q.  Two cats.  Did your mother's
2 cats go with you to Michigan?
3    A.  Yes.
4    Q.  On October the 3rd?
5    A.  Yes.  October the 1st.
6    Q.  Okay.  In that period of time
7 prior to October and even prior to when
8 you were sick in September when you
9 went and stayed in Michigan for some
10 time, did your cats go with you then?
11    A.  No.  My uncle kept them.
12    Q.  Okay.
13    MR. LOGAN:  Ted, before you
14 get started again, we've been going
15 about an hour.  Can we take a quick
16 break?
17    MR. TAYLOR:  Yeah, that's
18 fine.
19
20    (Short recess.)
21
22    Q.  (BY MR. TAYLOR:)  Ms. Lamb,
23 are you a member of any social or

Page 52

1 civic clubs?
2    A.  No.
3    Q.  Any churches?
4    A.  Yes.
5    Q.  Where are you a member of
6 church?
7    A.  Church of Jesus Christ of
8 Latter Day Saints.
9    Q.  Are you affiliated with a
10 local branch of that church?
11    A.  In Owasso.
12    Q.  How long have you been a
13 member of that church?
14    A.  All my life --
15    Q.  Of the Owasso?
16    A.  Well, I don't go as regular as
17 I should, but when my records were sent
18 there, I don't know the exact date.
19    Q.  Do you know a month?
20    A.  No.  I don't know when my
21 records were moved from --
22    Q.  Would it have been after
23 October 3rd, 2007?

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1    A.  Yes.  It would have been
2  after.
3    Q.  Prior to October 3rd, where
4  were your records, what local church of
5  Latter Day Saints?
6    A.  Because I moved around so
7  much, I know that they were sent to
8  California at one point.  I know they
9  were sent back to Montgomery at one
10  point.  But I don't know the exact
11  dates.
12    Q.  It's safe to say that at one
13  time, you were a member of a church in
14  California and at one time you were a
15  member of a church in Alabama prior to
16  October the 3rd, 2007, but in that time
17  frame between the accident and when you
18  got served?
19    A.  Let's put it this way:  A
20  Mormon is a Mormon.  Any church is the
21  same church.  It is just a different
22  building.
23    Q.  I understand.

Page 54

1    A.  My records go where I go so
2  that I can hold callings.
3    Q.  I understand.  I guess what
4  I'm trying to get to is where you were
5  practicing your religion at certain
6  times and --
7    A.  Where I was living.
8    Q.  Okay.  I'm trying to get dates
9  of when you were perhaps going to the
10  local branch -- local building in
11  Alabama.
12    A.  Sporadic, so I can't give you
13  a definitive date.  That is not to my
14  credit.
15    Q.  But you are definite that your
16  paperwork was in a local church in
17  Alabama --
18    A.  Yes.
19    Q.  -- or a local building in
20  Alabama at one time?
21    A.  Yes, positive.
22    Q.  And when your paperwork was at
23  that church, that was between the dates

Page 55

1  of the accident and when you were
2  served?
3    A.  Yes.  And some of those times,
4  it was in California.
5    Q.  All right.  Have you ever been
6  arrested?
7    A.  No.
8    Q.  Have you ever been charged
9  with a crime?
10    A.  No.
11    Q.  And I'm asking you this --
12    A.  Outside of --
13    Q.  I'm even talking about a
14  speeding ticket.  Just go ahead and
15  tell me.
16    A.  No.  I've never had a speeding
17  ticket.
18    Q.  Have you ever been sued?
19    A.  No.
20    Q.  Have you ever sued anyone?
21    A.  No.
22    Q.  Have you ever had to give
23  testimony at a trial?

Page 56

1    A.  Yes -- no.  Take that back.  I
2  was a juror.
3    Q.  Have you ever filed for
4  bankruptcy?
5    A.  Yes.
6    Q.  When was that?
7    A.  I don't know.  Well over ten
8  years ago.  I know it's off my credit
9  report.
10    Q.  Have you ever had any liens
11  filed against you or your personal
12  property or any real property?
13    A.  No.
14    Q.  Ms. Lamb, I don't want to get
15  into any kind of medical privacy
16  issues, but I would like to know when
17  you were last treated for any medical
18  condition anywhere.
19    A.  Emergency room --
20    Q.  Okay.
21    A.  -- in Owasso.
22    Q.  What was the date?
23    A.  I don't know.  I saw Dr. Ryan

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1  in Laingsburg three times. I don't
2  know the dates.
3      Q. Have these been since October
4  3rd, 2007?
5      A. Yes.
6      Q. When was the last time you saw
7  a physician in the State of Alabama?
8      A. That would be within the last
9  year, and that would be my neurologist
10  Dr. Hamp Green.
11      Q. Dr. Green, did you see him in
12  the month of September 2007?
13      A. I don't know. I don't know.
14  I'd have to call his office to know the
15  exact date.
16      Q. Could you do that and find out
17  when the last time you saw Dr. Green?
18      A. I could do that right now.
19      Q. That would be great.
20      MR. TAYLOR: Can we take a
21  break?
22      MR. LOGAN: Sure.
23

Page 58

1      (Short recess.)
2
3      A. (BY MR. TAYLOR:) January of
4  '07.
5      Q. And do you intend to see
6  Dr. Green again?
7      A. Yes. I will fly back to see
8  him. I will keep him as my
9  neurologist. I will have all of my
10  other doctors in Michigan, but I won't
11  give him up.
12      Q. Any other doctors in
13  Montgomery besides Dr. Green that you
14  have seen in the last year?
15      A. My family physician is
16  Dr. Keith Hughes.
17      Q. When was the last time you saw
18  him?
19      A. I can call him and ask.
20      Q. If you don't mind.
21
22      (Short recess.)
23

Page 59

1      Q. (BY MR. TAYLOR:) June of '06?
2      A. June of '06.
3      Q. And do you intend to see him
4  again?
5      A. No. When traveling, I saw
6  most of the doctors in California.
7      Q. Ms. Lamb, I want to talk to
8  you about telephone numbers a little
9  bit.
10      A. Okay.
11      Q. Your current telephone
12  numbers, what are they?
13      A. Cell phone, {760}554-2052.
14      Q. Okay.
15      A. I have two cell phones under
16  my name.
17      Q. Where is 760 area code?
18      A. California. I was working out
19  there when I lost my other cell phones
20  and I had to buy. The other cell phone
21  under my name is {760}554-2736.
22      Q. Are you familiar with the
23  number {706}554-5024?

Page 60

1      A. 706?
2      Q. It might be 760. How about if
3  it were {760}554-5024?
4      A. No. It would be 502 -- 2052.
5      Q. Okay. Are you familiar with
6  {334}244-0810?
7      A. My brother's number.
8      Q. And that's Michael Lamb?
9      A. Yes.
10      Q. I want to show you -- first,
11  let me ask you: Who is Dr. George
12  Bedmon and Robert Bedmon?
13      A. Dentists.
14      Q. And they're dentists in --
15      A. Lansing, Michigan.
16      Q. I'm going to mark as Exhibit 5
17  a record that you brought here today
18  from that dentist.
19
20      (Whereupon, Plaintiff's Exhibit
21      Number 5 was marked for
22      identification and is attached to
23      the original transcript.)

15 (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

```
1
2       Q.   On this document you brought
3   here today, it appears to be an
4   invoice; is that correct?
5       A.   Yes.
6       Q.   Okay.  And at the bottom, is
7   that your handwriting as a home phone
8   number?
9       A.   No.
10      Q.   What home phone number appears
11  there?
12      A.   That's my uncle's.
13      Q.   Okay.  And where the address
14  is located, that was listed as an
15  Alabama address prior to being changed,
16  it appears, by some --
17      A.   Oh, was it?
18      Q.   -- taping?
19      A.   Unless they did.  They could
20  have.
21      Q.   Okay.
22      A.   Because they mailed me one in
23  Alabama and one in Michigan.
```

Page 62

```
1       Q.   When did you receive the one
2   in Alabama?
3       A.   I don't know.
4       Q.   Okay.  Do you have any mail
5   that you've received in Alabama while
6   you were in Alabama?
7       A.   That I received in Alabama?
8       Q.   Uh-huh.
9       A.   A credit card.
10      Q.   Do you have any of those
11  statements?
12      A.   I don't keep them.
13      Q.   Do you still have those credit
14  cards?
15      A.   Yes, I do.
16      Q.   Have you changed the address?
17      A.   Yes, I have.
18      Q.   When did you change the
19  address?
20      A.   I don't know.  I paid them by
21  phone while I was traveling.  And at
22  one point, I had them start sending
23  them to Michigan, and I don't know
```

Page 63

```
1   exactly when.
2       Q.   Would that have been after
3   October of 2007?
4       A.   I don't know.  I believe it
5   was while I was in Charlottesville, but
6   I'm not positive.
7       Q.   Okay.  Going back to that
8   medical record we were talking about a
9   minute ago.
10      A.   Uh-huh.
11      Q.   What phone number -- you say
12  that's your uncle's phone number?
13      A.   Uh-huh.
14      Q.   And he lives at 120 Lost
15  Trail?
16      A.   Uh-huh.
17      Q.   And he maintains that number
18  to this date?
19      A.   Yes, he does.
20      Q.   Have you received any mail at
21  his house since September 24th, 2007?
22      A.   I'm sure because I haven't put
23  in a change of address yet.
```

Page 64

```
1       Q.   Okay.  Are you in possession
2   of any of that mail?
3       A.   No, I'm not.
4       Q.   When you were living with your
5   uncle or your mom or your brother --
6       A.   Uh-huh.
7       Q.   -- in Alabama, did you pay
8   bills to them?  Did you pay for any of
9   the utilities?
10      A.   Yes.
11      Q.   Who did you pay and how was it
12  paid?  How often and how much?
13      A.   I paid my uncle for groceries.
14  I paid for telephone bills.  He'd tell
15  me how much and I'd write him a check.
16      Q.   And when was the last time you
17  wrote him a check for groceries or
18  bills?
19      A.   I have no idea.
20      Q.   Would it have been as late as
21  September of 2007?
22      A.   I don't know.
23      Q.   Did you keep any record of the
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| | |
|---|---|
| Page 65 | Page 67 |

Page 65

1  bills you paid to him?
2      A.  No.
3      Q.  Could you have paid him as
4  late as October of 2007?
5      A.  Let me look at my checkbook
6  and see if it's in it.
7          MR. LOGAN:  Okay.  Sure.
8
9          (Discussion off the record.)
10
11      A.  6/12.
12      Q.  (BY MR. TAYLOR:)  Okay.
13      A.  No.  That was a loan payment.
14  I'm sorry.  I was paying him back for a
15  loan.  I can't tell which were loan
16  payments and which were food.  I'm
17  sorry.
18      Q.  You can't tell if they were
19  payments to your uncle?
20      A.  I can tell if they were
21  payments to my uncle, but I don't know.
22  Let's see.  2/23, 4/18, 6/12, and those
23  would be when I would write him checks

Page 67

1      A.  Uh-huh.  I did not change it
2  because I had no income to open another
3  account.
4      Q.  Okay.  And this is the only
5  bank account that you have?
6      A.  Uh-huh.  And it has $10.95 in
7  it, and that's my total net worth.
8      Q.  What about any loans other
9  than the one from your uncle?  Do you
10  have any outstanding loans?
11      A.  I have outstanding medical
12  bills.
13      Q.  And what providers have
14  outstanding bills with you?
15      A.  Baptist South, Martha
16  Jefferson in Charlottesville, Riverside
17  Medical Center.
18      Q.  Where is that located?
19      A.  California.  Conway Medical in
20  Selma, Owasso in Michigan.  I'm not
21  sure where else.
22          MR. TAYLOR:  Okay.  If y'all
23  give me just a few minutes, I can look

Page 66

1  for when I hadn't been able to pay him
2  previously when I wasn't working.
3  That's all I've got that I've written
4  down.
5      Q.  Now, you mentioned a loan that
6  you repaid your uncle for on June 12th?
7      A.  Yes.  I'd used his credit card
8  for previous dental work.
9      Q.  Do you still owe him for that
10  loan?
11      A.  Am I still paying him?  When
12  I'm working, yes.
13      Q.  And he's in Alabama, right?
14      A.  Yes.  My mother is paying for
15  my COBRA.
16      Q.  Bank accounts, what current
17  bank accounts do you have?
18      A.  One, Bancorp South.
19      Q.  Where is that Bancorp South
20  located?
21      A.  Brookwood, Alabama.
22      Q.  Is that the one out on
23  Highway 80?

Page 68

1  through and probably have a few quick
2  questions at the end.
3          THE WITNESS:  Okay.
4
5          (Short recess.)
6
7      Q.  (BY MR. TAYLOR:)  A couple of
8  things I forgot and I have to go back,
9  and I apologize.  I want to finish
10  going through the requests that we had,
11  and I hope you still have that in front
12  of you.  It will be the same as the
13  notice as well.  I believe we're on
14  Number 7.
15      A.  Okay.
16      Q.  And I'd asked you to produce
17  all bills and correspondence received,
18  including utility, water, garbage
19  sewer, electricity, gas, telephone,
20  credit card, bank account statements,
21  insurance, magazines and personal
22  correspondence between May of 2007 and
23  October of 2007.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

```
 1        Bank account statements from
 2   Bancorp South, do you have those on
 3   hand that you received?
 4        A.  I didn't keep them since
 5   there's no money in them.
 6        Q.  Are you still receiving bank
 7   account statements from them?
 8        A.  I haven't seen any.
 9        Q.  Could they be going to your
10   Alabama address?
11        A.  I have a change of address
12   there.  It would be forwarded.  Now, I
13   can't say they're not coming into the
14   house.  There's 12 children in that
15   house.
16        Q.  In which house?
17        A.  The one I'm living in.
18        Q.  Okay.
19        A.  Mail is lost.
20        Q.  Could you please follow up and
21   see if we can get a bank account
22   statement to your attorney as soon as
23   possible?
```

Page 71

```
 1        A.  Yes.  I don't have them.
 2        Q.  Okay.  Do you have health
 3   insurance?
 4        A.  COBRA.
 5        Q.  Do you have a co-pay?
 6        A.  Yes.
 7        Q.  Okay.  Have you kept records
 8   of your cancelled checks to pay the
 9   co-pay?
10        A.  No.  My mother is paying my
11   co-pays.  My mother is paying my COBRA.
12        Q.  Okay.  Number 10, I've asked
13   you to produce prescriptions for
14   medication.  Have you filled any
15   prescriptions between November 23rd,
16   2005 and September 23rd, 2007?
17        A.  I'm sure I have.
18        Q.  Do you have copies of any of
19   those?
20        A.  I don't have the copies, but
21   my --
22        Q.  Or dates they were filled,
23   perhaps?
```

Page 70

```
 1        A.  Okay.  The last one.
 2        Q.  That would be fine.  And
 3   really if possible, if they can replace
 4   them between May and October of 2007,
 5   those are the primary ones I'd like to
 6   get, which I'm sure they could produce
 7   for you, the bank.
 8        A.  Okay.
 9        Q.  If you would follow up with
10   them.
11        When you came back -- Number
12   8, I've asked you to produce any rent
13   or any hotel bill that you've paid or
14   that's been paid on your behalf for
15   September of 2006 or September of 2007.
16   Do you have any of those in your
17   possession?
18        A.  No, I don't.
19        Q.  Okay.  The next one, I've
20   asked you to produce documents showing
21   health care that you received.  Have
22   you produced all of that that you have
23   in your possession?
```

Page 72

```
 1        A.  My medications are prescribed
 2   to me by Dr. Green.
 3        Q.  Okay.  And you are on
 4   prescription medication?
 5        A.  Yes, I am.
 6        Q.  Your latest prescription
 7   prescribed by Dr. Green, could you get
 8   a copy of that label on that bottle and
 9   give it to your lawyer at your earliest
10   convenience?
11        A.  Yes.
12        MR. LOGAN:  If you have it.
13        A.  It's in Michigan.
14        Q.  (BY MR. TAYLOR:)  Okay.
15        MR. LOGAN:  And, Tedford, what
16   I may do is I may black out what the
17   medication is.
18        MR. TAYLOR:  That's fine.
19        MR. LOGAN:  I assume the only
20   information that you're interested
21   would be the address on the bottle; is
22   that correct?
23        MR. TAYLOR:  Right.  The
```

18 (Pages 69 to 72)

## FREEDOM COURT REPORTING

Page 73

1  address and the doctor and that sort of
2  thing.
3      A.  Well, I can tell you right now
4  the medications are all out of Baptist
5  Towers and mailed to me in Laingsburg.
6  So I can get Baptist Towers to --
7      Q.  (BY MR. TAYLOR:)  That may be
8  an easier route.
9      A.  -- give you a statement that
10  they're mailing all of my medications.
11  Because they mailed them to me in
12  California.  Now they mail them to me.
13      Q.  That's fine.  I just want to
14  make sure that it shows when the
15  medications were prescribed.  And I
16  don't need to know the medications;
17  just when they were prescribed.  And
18  that should be on the label of the date
19  that it was filled.
20      A.  You just want the last set
21  or --
22      Q.  Well, actually --
23      A.  They're monthly medications

Page 74

1  from Dr. Green.
2      Q.  If I could get them monthly
3  back to, let's say, from May 2007.
4  That way I can have that from May until
5  the present.  That will give me an idea
6  of when addresses were changed and that
7  sort of thing, okay?
8      A.  Okay.  I guess the pharmacy
9  will have them where they mailed them
10  out to.  If they have them, I'll --
11      Q.  Okay.  Great.
12          And moving expenses, do you
13  have any written evidence of any moving
14  expenses you had?
15      A.  Moving expenses were my mom's.
16      Q.  Okay.  So it would be safe to
17  say that moving expenses were -- the
18  money was spent when y'all moved
19  between October 1st and October 3rd,
20  2007?
21          MR. LOGAN:  Object to the
22  form.
23      A.  That was rental car under me

Page 75

1  and the hotels.  As far as our moving
2  her furniture, that was -- I don't
3  know.
4      Q.  (BY MR. TAYLOR:)  Okay.  And
5  you moving your furniture in November
6  of 2007?
7      A.  Her furniture.  I don't own --
8      Q.  Okay.  It is true you have not
9  voted in Michigan; is that correct?
10      A.  That is correct.
11      Q.  And you have not registered to
12  vote in Michigan?
13      A.  That is correct.
14      Q.  It is true you have not paid
15  taxes in Michigan?
16          MR. LOGAN:  Object to form.
17  What type of taxes are you referring
18  to?  Sales tax?  Income tax?
19          MR. TAYLOR:  Income tax.
20      A.  No, I haven't worked, except
21  for this last week.
22      Q.  (BY MR. TAYLOR:)  And it's
23  true you were working in Alabama at

Page 76

1  some point in the year 2007 for Adidas?
2      A.  No.  Adidas is 2005.
3      Q.  Okay.  I have my dates wrong.
4  I'm sorry, Ms. Lamb.  I didn't mean
5  to --
6      A.  Prison is 2006.
7      Q.  You're correct.  It's On
8  Assignment I was thinking.
9      A.  And I did not work in Alabama.
10  I have not worked in Alabama since the
11  prison.
12      Q.  Okay.  It's true that you have
13  a nursing license in Alabama?
14      A.  Yes.  It's my original state.
15  I always keep one.
16      Q.  And it's true that you are
17  attending your church of Latter Day
18  Saints in Michigan and your paperwork
19  was sent up there from your Alabama
20  church some time after October the 3rd?
21      A.  Yes.
22      Q.  It's true that you have a bank
23  account in Alabama and do not have a

19  (Pages 73 to 76)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 77

1   bank account anywhere else?
2      A.   Correct.
3      Q.   You have not been employed by
4   an employer located in Michigan until
5   you began your job last week; is that
6   correct?
7      A.   Correct.  I have not been
8   employed by anyone.
9      Q.   And you are not a member of
10  any professional, civil, or social
11  organization?
12     A.   Correct.
13     Q.   And you do not have any real
14  property in Michigan?
15     A.   Correct.
16     Q.   Okay.  Ms. Lamb, if you would,
17  follow up and --
18        MR. TAYLOR:  Jereme, I hope
19  you kept records of everything that I
20  wanted to try --
21     A.   Excuse me.  I may have
22  answered something wrong.  I do have
23  cable in Michigan.

Page 78

1      Q.   (BY MR. TAYLOR:)  Okay.
2      A.   That's under my name.
3      Q.   Have you paid -- do you have a
4   statement for that bill?
5      A.   No, I don't.
6      Q.   Okay.
7      A.   But I'm sure that one is at
8   home since it's current.
9        MR. LOGAN:  As far as the
10  records that you have requested, send
11  me a letter.
12        MR. TAYLOR:  I'll do it.
13  That's easier.
14        MR. LOGAN:  That way, I'll get
15  you exactly what you're looking for.
16     Q.   (BY MR. TAYLOR:)  That's all
17  the questions I have, Ms. Lamb.  I
18  would like, if you would cooperate, to
19  get these documents as soon as
20  possible.  We have a deadline coming up
21  very soon and we're running behind a
22  little bit.  So I want to try to make
23  that deadline and get this matter over

Page 79

1   with as soon as possible.  Okay?
2      A.   I would like that, too.  Thank
3   you.
4        MR. TAYLOR:  Thank you.  And
5   thank you for coming down.
6
7        (Further Deponent Saith Not)
8
9        (Whereupon deposition concluded
10            at 2:45 p.m.)

Page 80

1        C E R T I F I C A T E
2
3   STATE OF ALABAMA     )
4   COUNTY OF JEFFERSON  )
5
6      I hereby certify that the above
7   and foregoing deposition was taken down
8   by me in stenotype, and the questions
9   and answers thereto were transcribed by
10  means of computer-aided transcription,
11  and that the foregoing represents a
12  true and correct transcript of the
13  testimony given by the witness upon
14  said hearing.
15     I further certify that I am
16  neither of counsel, nor kin to the
17  parties to the action, nor am I in any
18  way interested in the result of said
19  cause named in said caption.
20  -------------------------------
21  Jodi D. DuBose, CSR, Notary Public
22  Certificate No:  AL-CSR-504
23  My Commission Expires:  7/01/2011

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660